State Bank of Waterloo v. K.C. Development Group, et al., No. 5-170375. May it please the Court, Mr. Kucinich. I'm Jay Hutch. I'm the counsel for Plaintiff and Appellant, State Bank of Waterloo. We're here today on a case that's basically a pretty simple promissory note, which is a loan agreement, and also followed up by an extension agreement. The background is there was a borrower, K.C. Development Group, LLC, which is an entity owned by two individuals through their personal corporations, owned by Kenneth Osterhage and defendant Charles Hesse. They own, respectively, KDO, Inc., which is Osterhage, and Hesse Development, Inc., which is Charles Hesse. They went to the State Bank of Waterloo, borrowed the money to refinance the purchased property and to develop it in the yield time period of December 2008, right before the financial and real estate crash. At the time they went to the bank, the banker, Altadonna, President Altadonna, thought they were going to individually own the entity, K.C. Development. He later learned that they planned to do it through their corporations. They received a loan, Mr. Altadonna prepared, and the preparation showed two signature lines for each party. The members of the LLC were the two corporations. So it has the note prepared with the borrower, K.C. Development Group, the entity that received the funds, signed by Hesse Development, Inc., by its president, Charles Hesse, and then a separate line for Charles Hesse personally. In addition, the other entity, KDO, Inc., by Kenneth Osterhage, President, as the member, and then a separate line for Kenneth Osterhage personally. Well, as the courts are aware, things didn't do well in real estate development in 2008, and thereafter, things went south, and the bank was required to foreclose the property and to sue the individuals as well. Now, in each case, the loan agreement, and five years later, December 2013, the extension agreement, they were signed twice by Mr. Hesse, once for his corporation, as the member, once personally. Same thing, of course, for Mr. Osterhage. The issue before the court, where the court found the note or loan agreement ambiguous, is because it couldn't get beyond the question of, why did Charles Hesse sign it twice? The borrower is shown in the upper left-hand corner in a box to be the entity, KD Development, but he also signed it personally. The court just never could appreciate the fact that not every signatory to a note is necessarily a borrower. You can be an endorser, you can be an accommodation maker, and in fact, that's what occurred here. Charles Hesse and Kenneth Osterhage lended their personal credit to the debt of an entity that they were basically the principals of. They lent their personal credit to the debt of KD Development Group. Well, the court looked at it and said, it's ambiguous, and because of that, we need to take testimony on what was the party's intention. I believe that to be the first error of the court, and that error was made a couple of times. We filed two motions for summary judgment prior to trial. Each time, the court found the note to be ambiguous. Why did Mr. Hesse sign twice? That also carried through with the trial court thereafter, the trial determination. So, when you have an ambiguous document, you know, first of all, if it's not ambiguous, you need to look at the four corners of the contract or document itself, and you're to attempt to provide meaning to each and every term. Well, this document defines borrower, but it also defines, there's an obligations, excuse me, there's an obligations independent clause on the second page, and it says as borrower in the first page, it is Hesse Development, but on the second page, it defines borrower as, or it defines I in the first page as the borrower, but on the second page, it says each borrower who signs the note and each other person who agrees to pay the note, such as guarantors, endorsers, sureties. The obligations independent clause says you agree to pay the note by signing the note. So, if you sign the note, you're agreed to it. And right above the signature line, it says I agree to the terms of the note, including those on the second page, where borrower is defined, I is defined to be more than the borrower, but anybody who's agreed to pay the note. So, the court said, you know, why did he sign the second time? Well, there's only one explanation. There's only one possible explanation, and that is you're there is no possible reason for why this person would have signed the note twice. You couple that with what the language is on the document itself, and you couple that with standard commercial lending, which is having a co-maker or co-signer for a closely held entity, then you understand that's the only possible reason for signing it the second time personally. Counsel? Yes, sir. So, the court found this to be ambiguous, and then took evidence, and I suppose there was testimony then, and some other explanation was given? There was much less evidence from basically three witnesses. The president of the bank, former president of the bank, since retired, Mr. Hesse, and by his former business partner, Mr. Osterhage. Mr. Osterhage testified they knew going in that they were personally liable. That's why the bank required us to bring in our personal financial savings, why the bank required us to bring our personal tax returns. My partner, Mr. Hesse, knew we were personally liable, and in fact, the court looked at, in the credibility issue, kind of strange, the fact that Mr. Osterhage settled with the bank, but Mr. Osterhage had many other loans. He gave all of his property, all of his cash, basically, to the bank in excess of a million dollars. Now, the court seemed to look at this as he had nothing to lose by his testimony. Well, I can tell you, my experience is, after you take over a million dollars from an individual and basically take everything they have, they tend not to be helpful witnesses for you later on. If they have a bias, it's not against their longtime friend and business partner, it's against a bank that they just gave over a million dollars to. But that was Mr. Osterhage's testimony, that they were personally liable. So the banker, the former banker, is retired, also without anything to gain from this. And by the way, Mr. Osterhage didn't agree to testify as part of his settlement, and got no credit for against whatever Mr. Hesse later paid, because he owed other debts, and all of his assets went to pay other debts. The lender testified, our bank policy is we look at the principles behind small, closely held corporations or entities. That's why we required Hesse and Mr. Osterhage to sign personally. He thought it was easier, rather than create a separate guarantee document, that the note the same note. Basically, they endorsed this note. We're co-makers, accommodation makers. His testimony is we took in their tax returns ahead of time. We looked at them repeatedly during the course of the loan. We looked at their financial statements. We sent 19 delinquency notices to Mr. Hesse as guarantor. Typically, it wasn't a guarantor, but that's how they showed it on the delinquency notice for the Casey Development loans. Between June of 2013 and February of 2014, 50-something installments were due. 19 were delinquent, and they sent the notices to Mr. Hesse, but further showed that they intended that Mr. Hesse was personally liable. There's no reason otherwise. Hesse testified, I never read the document. I just believe what they told me. I didn't read it, so he really has, but I never intended to be personally liable. I asked repeatedly that whether or not I had to put up more collateral, any other collateral. He testified, he never asked the question, am I personally liable? Well, we all know there's a significant difference between personal liability and additional collateral. If you are a guarantor or a surety, you may or may not be required to put up collateral. The bank took the collateral of the loan, of the real estate, took a mortgage from Casey Development because it owned the real estate, and then took the personal credit of the two accommodation makers, Hesse and Osterhage. It didn't require additional collateral from Mr. Hesse. He also testified, if I may, that he used his personal corporation, Hesse Development Inc., three times to make Casey Development loan payments. He also testified he used his retirement funds to make Casey Development loan payments. And then he gave his distorted version of when he first came to realize he may be personally liable. He used three different time frames, as early as October of 2013, and then somewhere between October and early 2014, when he had a meeting at the president, Mr. Day's office. What's interesting in between there is he signed a new extension and testified that he knew he was personally liable when he signed the new extension. So here we have a troubled loan, and he says he was willing then to give his personal credit behind the Casey Development loan. But usually it's a lot harder to give personal credit when the loan is headed south than up front when everybody sees this is going to be a big money maker. The second problem with the court then is it found that the bank did not meet its burden of proof in showing Hesse's intention with regard to personal liability. Well, that was wrong for two reasons. First, it wasn't a burden of proof of Hesse's intention, it was the party's intention. But secondly, and I think more importantly, it got the burden of proof wrong. It shifted it to the wrong party. The burden of proof at that point in time was on Hesse because the law is perfectly clear, and we cited the Millstock drilling case, and it's also clear under the UCC that if a person signs personally and they are attempting to state that their personal signature was not meant to be in a corporate capacity or representing the bank, the burden of proof shifts to them. And that makes perfect sense. So the court specifically found that State Bank of Waterloo did not meet its burden of proof when it didn't have the burden of proof at that point. The burden of proof was on Hesse to show that it was not meant to be a corporate debt, a personal debt rather. It was meant to be a corporate debt. The cases I cited are clear on how, what the law is if somebody signs individually. So the loan agreement signed individually is well in a corporate capacity. The extension agreement is exactly the same. And the extension agreement, by the way, has a clause, a paragraph in it saying that by terms of the original loan agreement, they're not restated, but they are incorporated specifically as part of that agreement. So we now have somebody who I believe the court did not find, you know, I think the manifest weight of the evidence was they were all meant to be, both meant, two of them, to be personally liable. That's the only explanation for signing separately personally liable. Court, looking at the evidence, should never have come up with its decision. Secondly, it gave the burden of proof to the wrong party. That is there. But I think initially never should have looked at what was the intent of the parties anyway in taking parole evidence. In UCC 4302, B also covers that as well. You do not take parole evidence unless you've already found that there is an ambiguity. So I think when we couple all those reasons, this appellate court should reverse the trial court, first of all, find that the document was not ambiguous, that there was no other possible reason for the second signature, to understand that an accommodation maker is somebody who signs a note for the benefit of the credit of another party. And that's obviously what occurred. And to also find that if it was ambiguous, the decision was against the manifest weight of the evidence. Of these three witnesses, the only one who basically had any skin in the game was Hesse. The bank president's retired. He doesn't gain anything. Osterhage is probably biased against the bank, but he testifies against his former partner and the bank. And he's not the only one who's biased against the bank. Is there any other questions for the court? I thank you very much. Thank you, counsel. May it please the court. My name is Tim Dukes-Kennect. I'm with the Laws Members' Company, and I represent Charles Hesse, who is the sole remaining defendant in this case. Counsel is absolutely right about one thing. The real estate market tanked at the end of the last decade. We can all agree on that. That's the only thing I'll agree with what counsel said. Quite simply, this is a case where there's a real estate project, and it goes south when the market tanks. And the bank gets the money from the sale of the property. The bank gets a settlement with the other defendant, as counsel indicated, in excess of a million dollars in cash, stock, and other land. And now they're trying to squeeze my client for more money in this case. Mind you, my client was the passive investor in this case. And he's the only person who didn't get a dime out of it. You know, the bank got the things I just talked about. Mr. Osterhage's company got paid for what it did. My client thought he was a passive investor, risking no dollars, never got a dime out of it. And now he's being asked to pay interest, late fees, over $100,000 in attorney's fees. Well, in order to be entitled to do that, the bank has to have its documents correct. And there has to be an intention of the parties that my client agreed to be personally liable for this. And that's just not the case. Under Illinois case law, where the representative capacity, it doesn't matter if there's the word under there that might say something different. The Kankakee Concrete Products case is almost like this. There, instead of having the word personally under the blank, it's said individually. But in that instance, as in this instance, the loan document was all set up for a corporate liability. So it was anomalous that there was this word individually under there. Here, the document is entirely set up for an LLC to be the borrower. It's the only entity listed as the borrower. And my only verb here, the only place in this note where anyone agrees to pay the note is where it says, for value received, I promise to pay you. And it just identified I as KC Development Group LLC. There's no other verb there for anyone else, any other entity, any other person, where they're agreeing to pay this. Counsel, what about, I suppose the counsel mentioned the second page or another page of the document, and it talks about guarantors and other folks. And I think he's characterized your client as maybe an accommodation signer. What about that language? Well, first off, the language they're pointing to on the back side is under a section marked Obligations Independent. Now, in notes like this, Obligations Independent clause is there so that if there is more than one party who has agreed to pay, they say, look, we don't have to go against them. We can go against you. That's why that paragraph's there so they don't have to, so nobody has a defense of saying, well, you didn't go after them first. You can't come after me to come after them, or you can only come after me for part of it. That's why that paragraph's there. But that paragraph says, it's saying if someone else has agreed by being a guarantor, there's no guarantee document. Frankly, if there had been a guarantee document, we wouldn't be here today because that would have made it clear. If my client's signing a separate document saying I agree to pay this, it would have been clear. We wouldn't be here. There'd be no ambiguity. There'd be no problems here. But they didn't do that. Or if someone agrees to be an accommodation maker, fine, where's the language in here where it says, I agree to be an accommodation maker? Frankly, the bank doesn't know what my client is. First they say, he's a borrower. No, he's not listed as a borrower. Well, he's a maker. Well, that's kind of funny because on the mortgage you prepared at the same time, it references this note and it says this note was made by KC Development. It didn't say it was made by KC Development and Charles Hesse and Kenny Osterhout. It doesn't say that. So they're not sure if he is a maker or not. And in fact, Mr. Alcidano who testified, the former president, he testified that my client was a borrower. So the bank has really kind of messed up on this. And counsel mentioned notices that they sent to my client after things started going south. It is that it was a guarantor there. Well, he would know that's not right. He didn't sign a guarantee document. So the bank's grasping at straws here, trying to find something that's going to stick. You know, borrower, accommodation maker, guarantor, none of this is going to work. And here's the big thing in their way. They drafted the documents. These documents are going to be most closely construed against the drafter. And that's what the judge did. He made it plain in his order that that's what he was doing. Okay. You draft the documents. You've got to make it clear what the intent of the parties is because we're going to construe it against you. And in this instance, it was far from clear. Now, counsel says there's no other reason he'd be signing twice. Well, that's not true. If you look at the initial approval letter from the bank, and I apologize I don't have the reference to it, talked about a guarantee of 50 percent from each of the owners of the LLC. Okay. Well, those owners weren't the individuals. Those owners were two other corporations. So my client probably thought he was signing because he knew his corporation was going to be asked to be possibly on the hook for this. And by the way, the 50 percent thing isn't there. And that's a funny thing. Counsel argues Mr. Ostargi said, well, I knew I was personally liable. His testimony was he thought he was 50 percent liable. That's not the bank's position with respect to my client. So it's really a confusing mess here. And a confusing mess works against the bank on this. Now, counsels already know the trial court got the burden wrong. Confusing mess my client should lose if it's a close case. I'd like to state for the record that argument's been waived. The first time we see any reference from the bank about the UCC controlling this is in their reply brief in this court. That wasn't raised in the trial court. It wasn't raised in their first brief here. Yeah, they referenced the Millstock case in their first brief, but they don't then say, by the way, this Millstock drilling case references the UCC. It's not until their reply brief that I first see bank's argument that the UCC applies some controls here to shift the burden. That's not permitted under a Supreme Court rule. I think it's 341. And there's a case that's not in my briefs because this came out after the reply brief, but there's a case of Bank of New York Mellon v. Rogers, a second district case from 2016, where someone tried to do the same thing and the court said, look, you didn't put it in your first brief. You didn't raise it in the trial court. Raising it in the reply brief violates rule 341, and that argument is waived. So the shifting of the burden argument is waived. If the argument had been made in the trial court, I could have argued it's not a negotiable instrument because it has to be clear that it is a negotiable instrument, and there are certain things that can take what starts as one and change it out of that, such as having a sum certain to be paid. On the face of this note, it mentions a sum certain, but then it mentions that payments are going to be as needed, and the interest only runs on that part that's been dispersed. So I think that would actually take it out of negotiable instrument, but I didn't get a chance to argue that in trial court because it wasn't raised. And further, even if it had been raised, I think the judge still would have found in this instance, all right, the UCC is putting a burden here, but they drafted it, so it kind of shifts it back because they're the ones who created the best in the first place. So the evidence, and I think the document, the judge is right in ruling that the document's ambiguous because the only time anyone says anything about paying it, it's with the noun I. The noun I is defined as Casey Development. It's not anyone else. So that makes it ambiguous, and once the evidence comes in, the judge heard two days' worth of evidence here, and he was not able to discern from that evidence a clear 10 of the parties that my client would ever be personally liable on this note. I told you about the mortgage document. I told you about, well, my client, a year after this started, was asked to fill out a disclosure of his finances. Mark Alfadana, the former president of the bank, filled it out in his own handwriting while talking to my client and didn't list this as a personal obligation. Now, their argument is, well, the bank knew about it, but there's no one in the instruction that says, by the way, you can leave off obligations that you owe to us. It doesn't say that at all. He left it out. He didn't think it was. Mr. Alfadana's testimony was extremely confusing. My client's testimony, I thought, was rather clear, and I think counsel misconstrues it. He was asked about this many times, and my client's a simple man. Now, the judge gets to, the trial court judge in this instance, gets to weigh the testimony based upon his observations to the witnesses. You don't get that ability here. You don't get to see. My client wears suspenders and climbed radio towers for a living, okay? And it was his testimony. Nobody told him. Nobody even gave him the idea he was personally liable on this note until at the very end, the last time he had contact with the bank, when he was told. No, you are personally liable, and guess what? We're going to rebank you. Well, there's a conflicting testimony. My client testified. Mr. Hutch said that. Mr. Hutch didn't testify to everybody. So his testimony was clear. That's the first time, several years later, that anyone suggested he had personal liability. First time. So his testimony was clear all along. He thought he was just putting money in. The reason he kept asking about collateral, he's a simple man. He's thinking in terms of, what do I have to risk here? Do I have to risk my house? You know, because his testimony was also that he never would have done this project if he thought that he was risking his house, that he was risking his retirement. He thought he was just risking some money that he had that he wanted to get a better rate of return on. Counsel, what about the argument that your client actually made payments from his retirement fund? What the testimony is, he used some of that money to put it into his corporation. His corporation made some of those payments on the LLC one. And his testimony was, the only reason I did that is, I'd sunk money into it. I thought there was a chance to rescue the project so I didn't lose that money. His testimony was not that. He was making those payments because he would have been foolish at the end because at the very end he told the bank, enough, I'm not going to put anything more into this. I'm walking away. If he thought he was personally liable, is that the kind of thing you would do? That would make absolutely no sense whatsoever. So his testimony is clear on that point. He's just trying to rescue the money he had in it. He wasn't trying to save himself from personal liability because he did believe he was personally liable. So I think the testimony was clear throughout. He really thought he had his money in it. And there's a bit of a misconstruction here. Yes, my client knew Mr. Osterhage a long time, but this was the only time they ever did anything business-wise. My client knew him from Mr. Osterhage had built a couple of projects for him. Mr. Osterhage here was the developer that all his projects were on. My client is not a real estate developer. So it's not like he was a business partner with this gentleman for a long time. This was their one and only deal. So again, my client is the one who didn't get anything out of this. They're trying to get interest, late fees, $100,000 in attorney's fees. And their documents just don't hold up for this. The judge found, correctly so, this is ambiguous. He listened to two days of testimony and decided that my client was telling the truth on this, that he didn't think he had personal liability. There was no meaning in the minds with respect to that. I commend to your reading the order of the trial court. I think he weighed the evidence very carefully on this. And I think he found at the end of the day there was no meaning in the minds as to my client being personally liable for this loan. The standard of view here is against the manifest way of the evidence. And you're supposed to construe these ambiguities most strictly against the bank. And as I said, that ambiguity could easily have been avoided if they did what every other bank has done in these situations and have a separate guarantee document. Under the circumstances, you can only reverse this if you find that Judge Doyle ruled unreasonably, arbitrarily, that his ruling was not based on the evidence. And I submit to you, he heard these witnesses. He knew who he believed and who he didn't. He even mentioned in his order that he found some of the testimony less than credible. And I think on that basis, his ruling is not against the and that this case should not be reversed and my client should not be found to be liable for this debt. Are there any other questions that the Court has? Thank you, Counselor. Thank you. Thank you. I have a number of points in rebuttal. First of all, what Mr. Gucinec raised and directed attention to in the note was the Obligations Independent Clause. But the definition of I is on the second side as well. And it says I means each borrower assigns his note and each other person or legal entity, including guarantors, endorsers, and charities who agree to pay this note. That part he omitted. The Obligations Independent Clause says by signing the note, you're agreeing to it. So that's why signing the note makes you obligated. Plus, common law, if you sign the note, you agree to pay the terms. And in fact, what the Court has done is change the language from I promise to pay to borrower promises to pay and no one else. Well, there's a reason for the second signature. Secondly, the approval letter he referred to was covered in the trial and covered in our brief. At the time, there was no notice to the bank that the members of the entity were not going to be HESI and OSTRAHUKI individually. It was later determined, and that's why the note provided for them signing and not their entities. They knew at that time that it was always the principles behind the entity, the principles behind Casey development, the principles behind KDO and H and HESI development were Charles HESI and Kevin OSTRAHUKI. The financial statement he referenced covered as well, but Mr. Altadonna's testimony was he asked HESI the information. He questioned him. He ended up preparing this financial statement because HESI was sloppy, but he put down exactly what HESI told him. He didn't give him the answers. He asked him the question, wrote down what HESI told him. He didn't care that HESI didn't tell him about the state bank debt. The whole purpose of this collection of further information from the co-maker, the accommodation party, after the loan is made is to see their continued credit worthiness. He knew about the state bank debt. There's no reason to have to ask, well, don't you also own money here? He just wrote down what he was told. The personal liability issue he talked about, as I said in my open, there were three different time frames that Mr. HESI claimed. He first realized he personally liable. Yes, the one time was when he met Mr. Day and I was at the bank. Earliest time was sometime in October 2013. In between there, he signed his loan extension agreement, and he testified. He signed it personally again, and he testified specifically. I agreed to it personally. He knew when he signed it was personal. To say that he walked away because he didn't think he was personally liable, that was after he signed the extension agreement and after he acknowledged in court that he knew he was signing it personally. The fact that counsel keeps relying on a concrete case, that really isn't the one on point. That's one where they show that the guy, Mr. Manns, was to have signed the loan individually, but he signed his name Louis J. Manns, press. And the court said he signed it in his corporate capacity. Even though it was prepared to be signed individually, he signed it in his corporate capacity. He's not liable. That's not our case. We have him signing both corporate capacity as president of HESI Development, a member of the KC Development Group, and we have him second signing where he's signing it individually. The court has, counsel says we waive the right to argue birds in a perch. I direct the court's attention to page 37 of the brief, our initial brief, which states as follows. Furthermore, where proof is permitted that personal liability of the signer was not intended, such proof must be more than a self-serving allegation of subjective intent on the part of the signer. And the burden of proof to establish mutual understanding or agreement is on the signer, see Mills.Dorelli. So we did not first bring this up in connection with the UCC. I thank you very much for your time. Thank you, counsel, for your arguments. The court will take this matter under advisement and render a decision in due course.